# STATE OF MICHIGAN

# COURT OF APPEALS

RPAD, LLC,

        Plaintiff-Appellee,

v

SALVATORE DINOTO, Individually, and
ESTATE OF FARA DINOTO, by SALVATORE
DINOTO, Personal Representative,

        Defendants-Appellants,

and

JOHN DINOTO,

        Defendant.

UNPUBLISHED
November 29, 2018

No. 338280
Macomb Circuit Court
LC No. 2014-002522-CZ

Before: M. J. KELLY, P.J., and SAWYER and MARKEY, JJ.

PER CURIAM.

In this action seeking to set aside a deed under the Michigan Uniform Voidable Transfer Act (MUVTA), MCL 566.31 *et seq*., defendant Salvatore DiNoto, in his individual capacity and as personal representative of the Estate of Fara DiNoto (Salvatore), appeals as of right the trial court's order granting summary disposition in favor of plaintiff, RPAD, LLC (RPAD), and setting aside a quitclaim deed executed in 2008. We reverse the trial court's order granting summary disposition and remand for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

We begin by explaining the parties' relationships. Fara DiNoto (Fara) was married to Rosario DiNoto (Rosario), and both are now deceased. Among their children are Salvatore and John DiNoto. Salvatore has two children who are named after his parents, and to avoid confusion, we refer to these children as Fara II and Rosario II. Among John's children is Peter DiNoto (Peter). Salvatore, John, and Peter are the main individuals whose actions are at issue in this case. The primary subject of the case is a home that was owned and occupied by Rosario and Fara during their lifetimes. In 1997, a deed was executed that granted the property to

-1-

Rosario, Fara, Salvatore, and John as joint tenants with rights of survivorship. Rosario died in 2000, leaving Fara, Salvatore, and John as the owners of the home.

The topic of the present suit is subsequent quitclaim deed executed in 2008. Through this deed, Salvatore and John deeded the property back to Fara, leaving her as the only owner of the home. Then, in 2009, Fara executed a will. In this will, Fara bequeathed the home to Fara II and Rosario II on her death. Fara died in 2013 with no other known changes to her estate plan.

Also relevant to this case is a loan given to Little Road, LLC (Little Road), in 2005. Little Road was owned by Salvatore, John, Peter, and others. An entity named "The Private Bank & Trust Company" (the Private Bank) provided Little Road with a substantial loan, which was personally guaranteed by Salvatore, John, and Peter, among others. The loan went into default soon after the 2008 quitclaim deed was executed, and in 2010, the Private Bank obtained a judgment of over $600,000 against Little Road, Salvatore, Peter, John, and the other guarantors.

After Fara's death, John filed objections to the will in the case proceeding in probate court. These objections were resolved in November 2014, however, when John stipulated to dismiss his objections with prejudice. It appears that before deciding to dismiss the objections to the will, John and Peter decided to take a different approach. In April 2014, Peter, who had declared bankruptcy and had his debts discharged, purchased the Private Bank judgment for $11,500. Peter formed a new limited liability company, plaintiff, RPAD, LLC (RPAD), and assigned the judgment to RPAD for no consideration. John and Peter contacted Vincenzo Manzella, an attorney who had represented them in other matters against Salvatore. A letter disclaiming any conflicts of interest explained that RPAD planned to use Manzella's services to file a suit seeking to have the 2008 quitclaim deed set aside as a fraudulent transfer. According to the letter, John would be named as a defendant; however, John conceded that the transfer was fraudulent and that the deed should be set aside. Thus, he would not defend the suit and agreed that the value of the home should be used to satisfy the Private Bank judgment now held by RPAD.

The instant appeal arises from that suit, which was filed in June 2014. The complaint alleged that John, Salvatore, and Fara all understood that Little Road would be unable to pay the loan from the Private Bank when it was set to come due on October 26, 2008. The complaint further alleged that the 2008 quitclaim deed was executed in order to "hinder, delay and defraud The Private Bank & Trust Company . . . ." The complaint also alleged that at the time of the transfer, Salvatore and John were insolvent. The complaint sought to set aside the deed under the Michigan Uniform Fraudulent Transfer Act (now the Michigan Uniform Voidable Transfer Act (MUVTA), MCL 566.31 *et seq.*, and further, sought monetary damages against Salvatore.

Salvatore declared bankruptcy on December 14, 2014, resulting in the present suit being stayed. The bankruptcy was discharged on August 17, 2015, and subsequently, the present case was reopened. RPAD was allowed to file an amended complaint that no longer sought monetary damages against Salvatore. The amended complaint again sought to set aside the 2008 quitclaim deed under the MUVTA and to quiet title to the property such that title would be restored to its pre-2008 state.

RPAD first moved for summary disposition on September 6, 2016, under MCR 2.116(C)(10). RPAD contended that there were no factual disputes that the deed should be set aside under MCL 566.35(1), which provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Relevant to the instant matter, Salvatore responded by arguing that he was solvent at the time of the purportedly voidable transfer. He also argued that the 1997 deed was executed only for estate planning purposes, and that neither he nor John ever occupied the home or treated it as their own. Thus, Salvatore believed that the 1997 deed was never delivered and was thus ineffective to transfer any ownership interest to John or Salvatore. As a result, Salvatore contended that there was no asset to transfer by way of the 2008 quitclaim deed. Finally, Salvatore explained how Peter had come to own the Private Bank judgment and had then created RPAD and assigned the judgment to that entity. He argued that the present suit was simply a scheme crafted by John and Peter to take the disputed property away from Salvatore, part of a vindictive effort to harm Salvatore. Citing the unclean hands doctrine, Salvatore asked the trial court to dismiss the suit under MCR 2.116(I)(2) to avoid furthering this malicious pattern of conduct. The trial court denied both parties' motions in a written opinion. The trial court found that questions of fact existed regarding whether Salvatore was solvent and also whether the 1997 deed transferred any interest to John and Salvatore. The trial court did not address the unclean hands doctrine.

RPAD moved for summary disposition a second time on February 10, 2017. Relying on recent deposition testimony, RPAD argued that Salvatore was insolvent when he signed the 2008 quitclaim deed because he could not have paid the entire debt owed to the Private Bank at that time, nor could he have paid another $1.8 million loan owed by another entity and guaranteed by Salvatore and others. RPAD also argued that the intent of those executing the 2008 quitclaim deed was to avoid the reach of the Private Bank, and thus, the deed could also be set aside under MCL 566.34(1)(a):

> (1) Except as otherwise provided in subsection (4), a transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following circumstances:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Salvatore responded by arguing that the motion was no different from the prior failed motion. Relying on his own deposition testimony and several affidavits, he contended that the purpose of the 2008 quitclaim deed was to change Fara's estate plan, not to avoid creditors. And he again raised the unclean hands doctrine, albeit briefly. Salvatore again explained how RPAD came to

own the Private Bank Judgment and wrote, "The conduct here of [RPAD]'s incorporators, and especially Peter DiNoto, who bought the debt and transferred it without compensation to Plaintiff, should be condemned, not abetted, by the Court."

At the hearing on the motion, RPAD presented a consent judgment agreed upon by RPAD and John. In this consent judgment, John admitted that the 2008 quitclaim deed was executed in order to avoid the reach of the Private Bank when Little Road defaulted on the loan. RPAD and John stipulated to the entry of an order setting aside the deed as to John, and in addition, granting a judgment of over $900,000 in RPAD's favor against him. After the parties argued the motion, the trial court explained only that it agreed that RPAD had proven that Salvatore was insolvent and would grant RPAD's motion. The trial court entered both an order granting the motion and setting aside the 2008 quitclaim deed as to Salvatore and the consent judgment the same day. Salvatore subsequently moved for reconsideration of the trial court's decision to grant the summary disposition motion. The trial court denied the motion "for the reasons previously stated on the record . . . ." This appeal followed.

## II. ANALYSIS

### A. EVIDENCE OF A FRAUDULENT TRANSFER

We begin with Salvatore's last argument, which is that summary disposition was improper when questions of material fact exist as to the application of MCL 566.35. We agree.

The trial court granted summary disposition under MCR 2.116(C)(10). "A trial court's grant of summary disposition is reviewed de novo." *In re Rasmer Estate*, 501 Mich 18, 30; 903 NW2d 800 (2017). "A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) when the affidavits or other documentary evidence, viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and the moving party is therefore entitled to judgment as a matter of law." *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). Questions regarding the proper interpretation of a statute are reviewed de novo on appeal. *In re Rasmer Estate*, 501 Mich at 30.

As this Court explained in *Dillard v Schlussel*, 308 Mich App 429, 445-447; 865 NW2d 648 (2014):

> A brief overview of fraudulent-transfer law helps place the statutory provisions in context. "The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated 'covinous and fraudulent' transfers designed 'to delay, hinder or defraud creditors and others.' " The Uniform Fraudulent Transfer Act (UFTA) [(now the Uniform Voidable Transfer Act (UVTA)], promulgated by the National Conference of Commissioners on Uniform State Laws, codifies the common law. The UFTA is "designed to prevent debtors from transferring their property in bad faith before creditors can reach it." . . . "The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society. It is a creditor-protection statute. Without such protection for creditors, '[c]reditors would generally be unwilling to assume the risk of the debtor's

fraudulent transfers.' " Our Legislature enacted the MUFTA in 1998[, and replaced it with the MUVTA, 2016 PA 552, effective April 10, 2017].

> The MU[V]TA defines two species of fraudulent transfers. The first encompasses transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose. MCL 566.34(1)(a). The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent. It applies only to transfers made after the creditor's claim arose. Three elements of proof are required: (1) the creditor's claim arose before the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer . . . ." MCL 566.35(1). [Citations and footnote omitted.]

While RPAD cited both actual and constructive fraud below, the trial court ultimately relied on MCL 566.35, as it found the question of insolvency to be dispositive. In the trial court, and again on appeal, Salvatore argues that there are factual disputes in two respects: (1) whether he was insolvent at the time of the transfer, and (2) whether there was any asset owned by Salvatore and John to transfer by way of the 2008 quitclaim deed at all. There is no factual dispute regarding the second of these questions, but there is with regard to whether Salvatore was insolvent.

We begin with the second question. Salvatore argues that the 1997 deed transferred nothing because it was merely done for estate planning purposes. He explains that Rosario and Fara continued to treat the home as theirs and theirs alone. Thus, he argues that there was no delivery of the deed executed in 1997, and accordingly, no transfer. As a result, and while not fully explained by Salvatore, Salvatore's position would seem to be either that the 2008 deed transferred nothing, and thus setting it aside has no meaningful effect, or alternatively, that because nothing was transferred in 2008, RPAD cannot possibly prove that "the debtor made the transfer . . . without receiving reasonably equivalent value in exchange," MCL 566.35(1), even though nothing was paid by Fara in exchange for the 2008 conveyance.

Before a deed passes title, it must be delivered. *Gillie v Genesee County Treasurer*, 277 Mich App 333, 348 n 5; 745 NW2d 137 (2007). In this context, however, the concept of delivery is not formalistic; the deed need not be physically delivered to the grantee or to anyone else. *McMahon v Dorsey*, 353 Mich 623, 626-627; 91 NW2d 893 (1958). Rather, "[t]he controlling factor in determining the question of delivery in all cases is the intention of the grantor, and this is particularly the case where the grantor makes a voluntary conveyance to grantees who are very naturally the subject of his bounty. In such cases, courts of equity are strongly inclined to carry out this intention unless to do so would run contrary to very convincing evidence or well-established legal principles." *Id*. (quotation marks and citation omitted). The object of delivery is to show the grantor's intent to effectuate the instrument. *Id*. at 627.

Salvatore's position places emphasis on whether he and John were ever treated as ordinary homeowners. Essentially, his position is that because the purpose of the deed was to effectuate an estate plan, rather than to give either Salvatore or John physical access to or control

of the property, the 1997 deed was not delivered. Salvatore's focus is misplaced. Delivery does not require that the grantor intend for the grantee to immediately occupy or control the property. Rather, the focus is on whether the grantor intends for the deed to convey an interest in the land. *Id*. at 626-627. Presuming Salvatore is correct and the only reason that Rosario and Fara executed the 1997 quitclaim deed was for estate planning purposes, we have little difficulty finding that delivery was accomplished. So long as Rosario and Fara desired that the deed have effect, delivery was accomplished. *Id*. That Rosario and Fara wanted the deed to be part of their estate plan shows that they wanted the deed to have effect.[1]

But with that said, there is clearly a factual question with regard to whether Salvatore was insolvent at the time of the transfer. The MUVTA includes a detailed definition of what it means to be insolvent, and how insolvency may be proved. In relevant part, MCL 566.32 states:

> (1) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.
>
> (2) A debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute is presumed to be insolvent. The presumption imposes on the party against which the presumption is directed the burden of proving that the nonexistence of insolvency is more probable than its existence.

In deciding the first round of summary disposition motions, the trial court explained that RPAD failed to produce any evidence that Salvatore was insolvent in 2008 when he executed the quitclaim deed. The trial court went on to explain that Salvatore had presented evidence tending to show that he was not insolvent. This included a check of several thousand dollars paid toward a debt, an affidavit signed by Salvatore, stating that he was solvent at the time, and a financial statement indicating that Salvatore's net worth, calculated by subtracting his debts from his assets, was nearly $3 million in June 2008, just a few months before he executed the quitclaim deed. Thus, the trial court found that factual questions existed regarding the insolvency element.

In the second round of summary disposition motions, RPAD presented what might be considered evidence of insolvency. RPAD presented deposition testimony explaining that Salvatore failed to pay (or more accurately, companies in which he was a part owner or member failed to pay) several large debts. The trial court seemed to believe that this was enough to prove

---

[1] We note that the trial court found a question of fact on this issue when it was raised in the parties' first round of summary disposition motions. Without any change to the relevant facts, the trial court granted summary disposition after the second round of motions. The trial court did not mention this issue at all at that stage, despite it having been again argued by defendants as a reason to deny RPAD's motion. Thus, there appears to be a logical gap in the trial court's own reasoning. But in this case, the trial court clearly reached the right result by refusing to conclude that a factual question existed regarding this particular issue. As this Court has often explained, "A trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Dep't of Transportation*, 256 Mich App 1, 3; 662 NW2d 822 (2003).

insolvency as a matter of law.[2] It is not. Pursuant to MCL 566.32(2), that a debtor is not paying his or her debts may create a presumption of insolvency. But this presumption only shifts the burden to the other side to prove "that the nonexistence of insolvency is more probable than its existence." MCL 566.32(2). Ultimately, insolvency is not defined by whether a creditor pays his or her debts; it is defined by MCL 566.32(1): "A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." Salvatore presented evidence, in the form of financial statements, indicating that his net worth (i.e., his assets, less his debts) was well in excess of $2 million. At a bare minimum, a factual dispute exists regarding whether Salvatore was insolvent at the time the 2008 quitclaim deed was executed.

In its brief on appeal, RPAD continues to argue that the failure to pay debts as they come due renders one insolvent as a matter of law, at least with respect to the MUVTA. This is an erroneous reading of MCL 566.32. MCL 566.32(2) only creates a *rebuttable presumption* of insolvency if one is shown not to have paid debts. The ultimate definition of insolvency is that stated in MCL 566.32(1). For the reasons explained, there is, at a minimum, a factual dispute regarding whether Salvatore was insolvent, as he presented evidence showing that in the months before the transfer, he had a net worth far exceeding $2 million.

RPAD's brief seems to also argue that the deed should be set aside under MCL 566.34(1)(a) because Salvatore intended to defraud the Private Bank by executing the 2008 quitclaim deed. RPAD relies on Salvatore's 2013 deposition testimony to claim that Salvatore has admitted that the deed was executed to avoid the Private Bank's reach in the event of an expected default on the loan by Little Road. RPAD's position is without merit. At the 2013 deposition, Manzella implied that the deed was executed to avoid the reach of the Private Bank. But his question, ultimately, was simply whether Salvatore executed the deed. Salvatore agreed that he did execute the deed, but his answers do not necessarily encompass the other implications made by Manzella. Thus, there is no such admission of intent to defraud.

RPAD argues that Salvatore's current claims, that the 2008 deed was executed at Fara's request, are not credible because Salvatore also testified that he had not discussed Fara's will with her before it was executed. "[S]ummary disposition is rarely appropriate in cases involving questions of credibility, intent, or state of mind." *In re Handelsman*, 266 Mich App 433, 438; 702 NW2d 641 (2005). RPAD's arguments, which question Salvatore's credibility regarding his own state of mind at the time of the transfer, cannot be resolved at the summary disposition phase. These questions must be resolved by a factfinder.

In sum, factual questions remain regarding whether the elements of MCL 566.34(1)(a) or MCL 566.35 may be established. Because these factual questions exist, summary disposition should not have been granted.

---

[2] RPAD also relied on the consent judgment between itself and John that was signed and entered by the court, arguing that it is evidence of Salvatore's insolvency. It is not. Even taking everything on the face of the judgment as true, it says nothing about whether any person or entity was insolvent. Rather, it is an admission by John that he intended to convey the property back to Fara to avoid the reach of the Private Bank; an admission of fraud under MCL 566.34(1)(a).

## B.  RES JUDICATA

Salvatore next raises arguments in which he asserts that, through the application of the doctrine of res judicata, two other actions (the probate matter and his own bankruptcy case) should preclude the instant suit.  Salvatore did not raise these arguments in the trial court. "Michigan generally follows the 'raise or waive' rule of appellate review." *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008)(citation omitted).  Nevertheless, an appellate court "has inherent power to review an issue not raised in the trial court to prevent a miscarriage of justice, generally a 'failure to timely raise an issue waives review of that issue on appeal.' " *Id*. (citation omitted).

We see no reason to decline to follow the general rule in this case.  There will be no miscarriage of justice because factual disputes remain that must be resolved in the trial court. When the matter is remanded to the trial court, Salvatore may raise his res judicata claims and have them adjudicated below, with RPAD being given a full and fair opportunity to respond. Accordingly, we decline to address Salvatore's previously unpreserved res judicata arguments.

## C.  UNCLEAN HANDS

This leaves the first argument Salvatore raised on appeal: that the unclean hands doctrine should bar RPAD from obtaining any relief in this matter.  Salvatore's primary argument is that equity should not allow John to benefit from his own admitted fraud.  Salvatore explains that John has now admitted that he signed the 2008 quitclaim deed in an effort to defraud the Private Bank.  He explains that John and Peter contrived this suit as part of a collective effort to ultimately take the property from Salvatore and his children.  Salvatore argues that John should not be allowed to benefit from his own fraudulent acts; consequently, the trial court should have granted summary disposition in Salvatore's favor.  Salvatore also argues that Peter violated his fiduciary duties to Little Road, and because of that breach, he has unclean hands.  Salvatore chastises the trial court for failing to discuss or decide these arguments.

We decline to address these concerns.  While Salvatore mentioned the unclean hands doctrine in the trial court, his arguments were different from those presented on appeal.  In the trial court, Salvatore argued that Peter's conduct in purchasing the Private Bank judgment, creating RPAD, and pursuing the present suit were unfair, and he asked the trial court to dismiss the suit due to this perceived unfairness.  The present arguments were not made to the trial court before it decided the summary disposition motion.[3]

---

[3] Salvatore did, eventually, raise an argument that Peter breached fiduciary duties to Little Road in the trial court; however, he raised the argument in a motion for reconsideration of the trial court's decision to grant summary disposition in RPAD's favor.  "Where an issue is first presented in a motion for reconsideration, it is not properly preserved." *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 519; 773 NW2d 758 (2009).  Moreover, it is not an abuse of discretion for a trial court to deny a motion for reconsideration when the request is

We will not decide these issues raised for the first time on appeal. Ultimately, what Salvatore asks is for this Court to evaluate whether RPAD should be barred by the unclean hands doctrine from obtaining the relief it sought in the trial court. The unclean hands defense is an equitable defense. *Attorney Gen v PowerPick Club*, 287 Mich App 13, 53; 783 NW2d 515 (2010). The doctrine prohibits one with unclean hands from obtaining equitable relief from the trial court. *Id*. But whether any such relief would even be warranted in this case is an issue that depends first on proof that a voidable transaction occurred. See MCL 566.37. That remains a disputed issue. Further, while this Court reviews a trial court's equitable decisions de novo on appeal, a trial court's underlying factual determinations are reviewed for clear error. *McFerren v B & B Investment Grp (After Remand)*, 253 Mich App 517, 522; 655 NW2d 779 (2002). It would be more appropriate for the trial court to consider the question of the unclean hands doctrine in the first instance, where a more complete factual record may be developed and any factual disputes resolved.[4] The trial court will have that opportunity on remand, presuming Salvatore decides to raise the issues he now raises on appeal in the trial court.

## D. CONSENT JUDGMENT

Finally, we note that at points in his appellate brief, Salvatore asks this Court to direct the trial court to vacate the consent judgment it entered on March 6, 2017. He does not explain with any degree of clarity why he believes this is appropriate. And further, he did not seek such relief in the trial court. Accordingly, we need not address the question. *Walters*, 481 Mich at 387-388; *Prince v MacDonald*, 237 Mich App 186, 197; 602 NW2d 834 (1999) ("It is axiomatic that where a party fails to brief the merits of an allegation of error," or "fails to cite any supporting legal authority for its position, the issue is deemed abandoned.").

In any event, "consent judgments are final and binding upon the court and the parties, and cannot be modified absent fraud, mistake, or unconscionable advantage." *Laffin v Laffin*, 280 Mich App 513, 517; 760 NW2d 738 (2008). Salvatore fails to address this rule or provide any specific argument regarding why the consent judgment should be set aside in his appellate briefing. But because the matter must be remanded for further proceedings, Salvatore may raise such an argument in the trial court, explaining precisely why he believes the consent judgment may be set aside. For all of these reasons, we refuse Salvatore's requested relief in this regard, but without prejudice to his raising the issue in the trial court on remand.

---

based on arguments not timely raised in the trial court. *Pierron v Pierron*, 282 Mich App 222, 264; 765 NW2d 345 (2009).

[4] One factual issue that likely bears some investigation is whether Salvatore, regardless of his solvency at the time, executed the 2008 quitclaim deed with intent to defraud the Private Bank. See MCL 566.34(1)(a). There seems to be some factual support for such a conclusion, given John's position on the question and the credibility concerns noted by RPAD. It would seem fairly likely that if Salvatore did intend to defraud the Private Bank through the transaction, he would not be entitled to defend against the present suit by claiming that RPAD (or anyone else) has unclean hands. See *Attorney Gen*, 287 Mich App at 53 ("A defendant with unclean hands may not defend on the ground that the plaintiff has unclean hands as well.").

## III. CONCLUSION

We reverse the trial court's order granting summary disposition in RPAD's favor and remand to the trial court for entry of an order denying RPAD's motion for summary disposition and for further proceedings consistent with our opinion. We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ David H. Sawyer
/s/ Jane E. Markey

-10-